## M'Kinney *against* Reader.

In an action of trespass *vi et armis*, after proof of the trespass complained of, it is competent for the plaintiff to give evidence of the amount of inconvenience to which his family was put by the act of trespass.

In such action, under the plea of justification by the defendant, that he took the goods as a distress for rent, the plaintiff having called a witness to testify for him, it is competent for the defendant to show that the witness had connived with the plaintiff to cheat him out of his rent.

Under our act of Assembly regulating distresses for rent, and the right of the tenant to replevy the same, in computing the time in which the tenant may replevy, the day upon which the distress was made is excluded, and if the 5th day then be Sunday, the following Monday will be estimated as the 5th day; and during this time the landlord may impound the property distrained upon the demised premises.

The exemption of certain goods from a distress for rent, is a privilege which the law affords to tenants, and one which they may waive by their contract.

The omission of a landlord, upon his making a distress for rent, to give notice to the tenant of the distress, and the cause of it, if the goods distrained were replevied before sale, does not make him a trespasser *ab initio.*

An action of trespass will not lie against a landlord for distraining for more than was due.

ERROR to the common pleas of *Dauphin* county.

Samuel Reader against Henry M'Kinney and John Nise. This was an action of trespass *vi et armis*, for breaking and entering the tavern house of the plaintiff, and carrying away his goods. The defendants pleaded not guilty, and justified, under a warrant of distress for rent, the said Henry M'Kinney being the owner and

landlord. After the plaintiff had given in evidence, by the testimony of several witnesses, the taking of the goods, and in a manner which he alleged to be outrageous of his rights and of the law, he proposed to ask a witness, "how the plaintiff's family got along, as to the necessary utensils for cooking, for eating, chairs to sit on, &c." This the defendants objected to, but the court overruled the objection and sealed a bill of exception.

The plaintiff called Mrs Roarke, as a witness, to prove the acts of trespass complained of; and the defendants had given evidence tending to show that the plaintiff had removed some of his goods, to prevent a distress, and to defraud the defendant out of his rent.

He offered to show, after the evidence given, that the property removed by Reader, or those who alleged that they had purchased from him, was subsequently seen in possession of Mrs Roarke and Mrs Dyer, and that it eventually came into the hands of plaintiff. To show connivance between these witnesses and the plaintiff to defraud the landlord of his rent; to show that the plaintiff himself withdrew it from the premises to cheat the landlord and prepare to run away, and to show that plaintiff is not entitled to recover damages in this suit.

The plaintiff objected to this evidence, and the court sustained the objection, and sealed a bill of exception at his instance.

Four and twenty points were put to the court, by the respective counsel, upon which they were requested to charge the jury. The only ones material to the cause, and the answers to them, appear in the opinion of the court.

*Ayres* and *Johnston*, for plaintiff in error.
*Rawn*, for defendant in error.

The opinion of the Court was delivered by

KENNEDY, J.—The first error assigned is, a bill of exception to the opinion of the court below, in admitting evidence objected to by the counsel for the defendants there, who are the plaintiffs in error here. We perceive no error in the admission of the evidence mentioned in this bill. Though it was not evidence *per se*, to prove that a trespass, such as is laid in the declaration, was committed; still, however, as evidence had been previously given by the plaintiff below, tending to prove that fact, the evidence offered and objected to, went in aggravation of the injury produced thereby, if any, and would, therefore, seem to have been properly received.

The second error is an exception to the opinion of the court in rejecting evidence offered by the defendants below. We think the evidence set forth in this bill was admissible, and that the court erred in rejecting it. Mrs Roarke and Mrs Dyer had been adduced as witnesses by the plaintiff, and testified for him against the defendants, with feelings apparently not very favourable to the latter.

[M'Kinney v. Reader.]

Was it not, therefore, proper for the defendants to show, that if these witnesses were to be accredited at all by the jury, it ought at least to be with some grains of allowance? The testimony offered certainly went to show that they had taken part with the plaintiff; and if the defendant, M'Kinney, had a just claim for rent due against the plaintiff, to show further, that they had combined with the plaintiff to assist him in putting his property out of the reach of M'Kinney, the landlord, with a view to defeat him in getting his rent; in short to defraud him of it. The evidence, therefore, might have had, with the jury, a very material effect, as to the credit which they would have considered these witnesses entitled to, had it been received. Besides, it was material in another point of view, because it would have tended to repel the very effect which the evidence given by the plaintiff and mentioned in the first bill of exception, was intended to produce. To show in effect, that if the landlord, by distraining on the articles, had left the family destitute of the necessary utensils for cooking, &c., the plaintiff himself was the occasion of it by his fraudulent conduct, in putting all his other property out of the reach of the landlord, and leaving the latter no choice of articles to distrain on, in order to make up the amount of the rent due. We, therefore, are of opinion that the evidence ought to have been admitted.

The third error is an exception to the answer given by the court to the fourth and seventh points, submitted by the counsel for the defendants below. By their fourth point, " the court was requested to charge the jury, that when the property of a tenant was distrained for rent, the landlord and his bailiff had a right to impound or leave it on the premises, occupied by the tenant, out of which the rent issued, if they impounded or left it in the most convenient and suitable place, without doing any other injury to the tenant than necessarily followed the distress of the property; and that under this right, if they believed that the bar room occupied by Reader, was the most suitable and convenient place in which the property could be impounded, left and secured; and that Reader's wife desired the whole or any part of the property to be left on the premises, and that by so leaving it in said bar room, and securing it by the only adequate means of security, no injury resulted to the plaintiff, further than necessarily followed the distress of said property, then and in that case, defendants committed no trespass, by reason of impounding and leaving the property of the plaintiff in the bar room upon the premises, which would entitle the plaintiff to recover in that suit." In answer to this, the president judge of the court instructed the jury that, " the locking up the property in the bar room and keeping possession of the bar room six or eight days was illegal, unless it was done by the consent of the plaintiff's wife; whether the landlord could impound on the premises, in any case, without consent of the tenant, he would not then decide." The president, in his general charge to the jury, further instructed

[M'Kinney v. Reader.]

them that the putting of the goods distrained on into the bar room, and placing a young man in the room at night during the time before mentioned, was irregular, and being without the consent of the plaintiff, or, in his absence, of his wife, was illegal and made the defendants trespassers."

In this instruction, thus given to the jury, we think the court erred. By the evidence, in which there is no variance whatever, it appears that the distress was made on Tuesday, the 2d day of August 1836, when the goods distrained, with the exception of some articles, which were left with the plaintiff's wife, at her request, to be used by her until called for, upon her giving bail to deliver them up then, were all put by the defendants into the bar room of the house on the leased premises, and the door thereof locked by the landlord, who also kept the key, until the Monday following, the 8th of the same month, when he removed what he could find of the goods there; the plaintiff's wife, as it would seem, having some how, during the interim, obtained access to the room, had abstracted part of them. If, in reckoning the five days allowed by our act of assembly, to the tenant to replevy his goods when distrained for rent, Tuesday, the day on which the distress was made, be excluded, the 5th day then fell on Sunday. Two questions then arise here: First, In computing the five days, shall the day of the distress be included or excluded? And, secondly, Shall Sunday be counted as one of the five, when it happens to be the last of the five if counted? According to the rule adopted and laid down in Gosweiler's Estate, 3 *Penns. Rep.* 201, Tuesday, the day on which the distress was made here, would be excluded and Sunday could not be counted as one of the five days; Monday, therefore, would have been the 5th day after the distress. It is true that a different rule has been adopted in England, in reckoning the five days allowed for a like purpose by the statute of 2 *W. & M. sess.* 1, *c.* 5, *sec.* 2, as to the commencement or first day thereof; in Wallace *v.* King, 1 *Hen. Bl. Rep.* 13, the day of the distress was held to be the first of the five days. This we think, however, is rather too severe a construction against the tenant; and as there is nothing in the act of assembly itself, which requires that the usual mode of reckoning time, as laid down in Goswieler's case, should be departed from, we not only deem it a reasonable indulgence to the tenant, to allow him the benefit of five full days at least to replevy his goods, if he should think proper to do so; but the legislature, being acquainted, as may be supposed, with the rule that prevails in regard to the computation of time in such case, may, therefore, be presumed to have intended that the day of the distress in reckoning the five days should not be included, otherwise, they would have in terms directed that it should be so. Tuesday, then, the day on which the distress was made here, being excluded by the rule, the 5th day following happened to be Sunday, but Sunday being *dies non juridicus,* a day on which the

[M'Kinney v. Reader.]

tenant could not sue out a writ of replevin or have any proceeding
of the kind, it cannot, therefore, be counted as one of the five; and
Monday must, of course, be reckoned as the 5th and last day,
within which the plaintiff might have replevied the goods. Seeing
then this time was allowed to him for this purpose, can it be con-
sidered as prejudicial to him, that a reasonable portion of the leased
premises was taken by his landlord and appropriated to the safe
keeping of the goods distrained, during that period. It must
doubtless be in most, if not in all cases, an accommodation or be-
nefit to the tenant that the goods are not removed from, but kept
on the leased premises as long as he has a right to replevy them.
It certainly saves to the tenant an expense, which would necessa-
rily attend the removal of the goods. The removal of goods dis-
trained was one of the great evils complained of, that existed at
common law. The landlord might have driven the distress from
the place where it was taken into another place, even into a dis-
tant county. 2 *Inst.* 206. It is obvious that the exercise of such
a power must have been attended with great oppression; more
especially as the tenant was obliged to provide sustenance for his
beasts, if they were impounded in an open pound; and the beasts
being driven into a foreign county, the tenant frequently might not
even know where to make a replevin of them. As a partial
remedy against this evil, 52 *Hen.* 3, c. 4, was passed; which pro-
hibited a distress from being driven out of the county where it was
taken. And again, by 1 and 2 *P. & M. c.* 12, it was further provided,
that no distress of cattle should be driven from the hundred, &c.,
where the distress was taken, except it be to a pound overt with-
in the same shire, not above three miles distant from the place
where taken; and no distress made at one time to be impounded
in several places, under a penalty of one hundred shillings and
treble damages. Every act of the legislature in England, respect-
ing the right of the landlord to distrain for rent, seems to have been
passed for the purpose of restraining him in the exercise of this
right and securing the tenant against being stripped of his property
in an unreasonable manner, until the statute of 2 *W. & M. c.* 5,
which bestowed on each some advantages which he did not before
possess. Our act of assembly is partly a copy of this statute.
Under this act, the landlord having acquired an authority to sell
the goods distrained, if not replevied by the tenant within the *five
days* before spoken of, it would seem from what President Shippen
has said in Woglam *v.* Coperthwaite, 2 *Dall.* 69, that it has been
the usage, both before and since the passage thereof, to impound
on the premises agreeably to the directions of the act of 11 *Geo.* 2.
The clause authorising a sale in the statute 2 *W. & M. c.* 5, is
transcribed, almost *verbatim*, in our act of assembly, superadding
thereto a requisition of six days previous notice for the sale, not in
the English act. And President Shippen says, the case of Griffin
*v.* Scott, 2 *Stran.* 717, was determined some years before the sta-

[M'Kinney v. Reader.]

tute of 11 *Geo.* 2, in which the court say, that the defendant ought to have removed the goods, which were distrained by the defendant for rent, *at five days' end,* but having kept them for *eight* days in the house on the leased premises, he became a trespasser for the *other three days.* This, as President Shippen remarks, implied strongly, *necessarily* I would say, that the construction of the statute of *William* was, that the distrainer might leave the distress on the premises for *five days,* mentioned in the act, that the tenant might have the opportunity of replevying them in the *same plight in which they were distrained.* That the distress might have been kept for the *five days* on the leased premises by the lessor without his becoming a trespasser before the statute of 2 *Geo.* 2, appears to have been the opinion also of the English bar, ever since the opinion of the court of King's Bench expressed to that effect in Griffin *v.* Scott. In Reed *v.* Harrison, 2 *Bl. Rep.* 1220, Mr Walker, counsel for the plaintiff therein, whose interest it was to have contended against it, if he had thought so, says, " In distress for rent, they (meaning the goods) could not be kept there (that is, on the leased premises) lawfully *above five days,* and staying there longer made the distrainer a trespasser *ab initio;*" for which he cites Griffin *v.* Scott, 2 *Stran.* 717. And adds " but this was altered by statute 11 *Geo.* 2, showing that by the construction put on the statute of *W. & M.* the landlord was justified in keeping the distress on the leased premises during the space of the following five days, but that by the statute of 11 *Geo.* 2, he was still further protected from being deemed a trespasser if he kept it there beyond that period. In Washborn *v.* Black, *M. T.* 1774, in note to Winterbourne *v.* Morgan, 11 *East* 405, which was trespass for entering a house and taking goods, done in taking a distress for rent, after the distress was taken, a man was left till the 5th day, when the goods were replevied. During the five days the person left in the house went into *different parts* of it. Mr Dunning insisted that he was a trespasser; for he ought either to have put the goods all into *one room* and *kept possession of that only,* or to have removed the goods out of the house. And he cited a case of Thornton *v.* Cruthers and others, before Lord Chief Justice Wilmot, where it was so holden. Lord Mansfield, Chief Justice, said that the strict law was so; and that the man might, if he pleased, have stripped *every room* and put *all the goods together,* and by that means greatly damaged them." So that the course adopted and pursued here by the defendants below would seem to be the one that has been judicially approved, both here and in England; and doubtless must commend itself to the reason and good sense of every intelligent mind. In the case last mentioned, Lord Mansfield also left it to the jury, to determine whether the tenant's wife, the husband absent, had not consented to the landlord's interfering with the different rooms in the house as he did; though there was no evidence of any express assent, other than that she had been heard to

say, "how much she was obliged to Mr Mountfort, who had acted like a gentleman." Had it, therefore, been necessary for the justification of the defendants below, it might perhaps with propriety have been left to the jury to be decided as a matter of fact, whether the wife of the plaintiff, whose husband had fled from the county, with an intention, it would seem, to abandon the leased premises, as he has never returned since, but shortly afterwards procured his family to follow him, had not impliedly at least assented to the defendant's depositing the distress in the bar room and keeping it there, until he removed them. It is clear, that some part of the articles distrained, were left in the house at her request, that she might have the use of them for the time being, upon Mr Davis's becoming bail, that they should be produced when required. These articles were not put into the bar room. And the landlord having thus disposed of part of the goods distrained, by leaving them in the house, it possibly might be a question, whether, without her consent, he could have removed the residue and impounded these in a different place, unless by consent, as it might possibly have been said that it was against the statute of 1 and 2 *P. & M.* which we have seen among other things, forbids that a distress made at one time shall be impounded in several places. It was, at all events, evidence upon which the decision of the fact of her having assented to the goods being impounded in the house, might have been submitted to the jury.

Something was said about the defendant's having distrained on goods that were exempted by law. That, however, could not be; for the exemption being a privilege conceded by the act of assembly, for the special benefit of the lessee or tenant alone, he had a right to waive it; and he did do so expressly in this instance by a clause in the lease to that effect.

As to the seventh point submitted by the counsel of the defendants below to the court, it is not material to examine it further than to show that the court erred in their direction to the jury, as to the effect of not giving the notice required by the act of assembly, advising the tenant of the distress and the cause of taking it. The court below say, in their charge to the jury, "In this case there is no evidence of any notice of the distress taken, with the cause of such taking, having been given to the tenant or left on the premises. This omission is fatal to the proceedings of the defendants. It renders their whole proceedings under the *right of distress* illegal, and takes from them that *ground of justification*." In this we think the court erred; for, at common law, such notice was not required; and would seem to be necessary, under the act of assembly only, in order to warrant a sale of the distress agreeably to the directions thereof. But as no sale was made of the distress in this case, the mere omission to give the notice required, cannot, of itself, be considered sufficient to make the landlord a trespasser *ab initio.* A mere non-feasance does not amount to a trespass. The Six

[M'Kinney v. Reader.]

Carpenters' Case, 8 *Co.* 146. But here it may be said, that the landlord evinced his intention to proceed and sell; but certainly that was all he did; and at most, it was only a declaration of intention, which will not, without some act done in pursuance of it, constitute a trespass. There must be some positive act done, that is incompatible with the right of the party to make the distress, in order to render him a trespasser *ab initio.* Gates *v.* Lounsbury, 20 *Johns. Rep.* 427.

The court below also seem to have thought, that if the defendants distrained for more rent than was due, they thereby became trespassers. In this we also think there is error; for it is in effect but an excessive distress, which at common law was perfectly allowable; because it was more likely to induce or compel the payment of the rent due. And until the statute of Marlbridge, 52 *Hen.* 3, *c.* 4, there was no restriction upon the landlord in this respect. By that statute, however, it was provided, "that all distresses should be reasonable, and that persons taking unreasonable distresses should be grievously amerced for the excess of such distress." But, notwithstanding the provisions of this act, it has been settled that the entry and distress being lawful in part, for the rent actually due, and the whole being only one act, trespass will not lie; that it is not like the case of a subsequent abuse of the distress. But the proper remedy is an action on the case founded on the statute of Marlbridge, 3 *Lev.* 48; Lynn *v.* Moody, *Fitzg.* 85; *S. C.* 2 *Stran.* 856; Hutchins *v.* Chambers. 1 *Burr.* 590. The court also seem to have entertained the opinion, where the rent is payable quarterly and one quarter's rent has become payable, and part of the second quarter has run, as was the case here, that the landlord may not only distrain for the quarter's rent that has fallen due, but for the portion of the second quarter that has passed. This is clearly a mistake of the law in this respect; so far from it being in the power of the landlord to do so, that he cannot even distrain on the same day that the rent becomes due; but must wait at least until the day after, which is the earliest time at which he can distrain for it, if not paid. 1 *Inst.* 47, *b., note* 6; Sir M. Hale.

In regard to the liquor of the plaintiff that was testified to have been drunk, upon the giving out of the defendant, the landlord, if the maxim *de minimis non curat lex* be not applicable to it, it will not make the defendants trespassers as to their entry into the house; the landlord alone, who acted in this matter, might perhaps in an action of trespass *de bonis asportatis* be made responsible for the worth of it. Dod *v.* Monger, 4 *Mod.* 216. But it would seem rather to have been given as a treat or compensation to those who were employed in putting the property distrained into the bar room, which the plaintiff, as the tenant, might ultimately have been obliged to satisfy, if it had not been done by means of what

VI.—F

was his own. It, therefore, possibly might have been a benefit instead of an injury to him.

Judgment reversed, and a *venire de novo* awarded.