# Coleman *versus* Grubb.

$\frac{23}{175}$ $\frac{393}{231}$

1. By a written agreement of 6th May, 1786, between persons interested in the Cornwall and other estates, it was agreed that partition be made, and that "*the ore banks belonging to Cornwall Furnace be divided into three parts*" and that the parts considering quantity and quality be allotted.

In a subsequent agreement dated 30th August, 1787, it was alleged that the former agreement could not be carried into execution without injustice to some of the parties, and it was agreed that "the ore banks belonging to Cornwall Furnace shall remain together and undivided as a tenancy in common, the parties interested to have certain portions, and that for this purpose *an accurate survey shall be made of the said ore banks and hills*, if not already done, and it is hereby declared to be the true intent and meaning thereof, that neither of the said parties, their agents or workmen, shall interfere or interrupt either of the other parties at any mine hole opened and occupied for the purpose of raising iron ore."

Another agreement was made on the same day as follows:—

Whereas, It hath been suggested that the article respecting the ore banks and hills requires further explanation, and that it may so happen that veins of ore may extend *beyond the limits of the survey made lately by Thomas Clark,* it is hereby expressly declared and agreed that the said Burd Grubb, Henry Bates Grubb, and Robert Coleman, and their respective heirs and assigns, shall have full liberty and privilege of ingress, egress, and regress, to and from the said *mine hills,* and shall have free and uninterrupted liberty and power to dig, sink shafts, drive drifts, raise and carry away any ore that may

[Coleman *v.* Grubb.]

be found to extend beyond the limits of the said survey, without doing any material damage to the iron works or plantations. And it is further agreed, that the privileges of the water are hereby secured in the most ample manner, for the use of the said Curtis Grubb and Robert Coleman, their heirs and assigns for ever, and that this memorandum be considered to all intents and purposes as part of the foregoing agreement.

It was *Held*, that under the first agreement of August, 1787, *the whole* of the mine hills was exempted from partition, and were to be held in common, and that either of the parties in interest had the right to take from within the natural boundaries of the three hills either surface or vein ore, not interfering with openings made by either of the others, and "without doing any material damage to the iron works or plantations."

2. In the absence of any survey as referred to in the supplemental agreement of 1787, the said agreement is to be considered as an extension instead of a limitation of the rights of the tenants in common; and under the supplemental agreement shafts might be sunk and drifts made beyond the base of the mine hills for the purpose of mining veins found to be contained in the hills.

3. If the terms of the agreements were doubtful the usage of the parties during two generations in taking ore from the hills for their respective furnaces would be an important element in their construction.

4. Neither party could maintain *trespass* against the other for removing surface ore from one of the hills from above its base.

5. The rule that judgment cannot be entered on a general verdict for a plaintiff where his declaration contains two or more counts one of which is bad, does not apply to the pleas of a defendant sued in trespass. If he have a single good plea which goes to the plaintiff's right of action, and a general verdict is rendered for him, he is entitled to judgment though some of his pleas were bad, unless it appear that the evidence was inapplicable to his perfect plea.

6. Though counsel has a right to submit his client's cause to reference, the latter may revoke the submission before it is acted on.

ERROR to the Common Pleas of *Lebanon county.*

This was an action of trespass to August Term, 1852, by Ann C. Coleman and others, by their guardian John Reynolds, *v.* Samuel Houck and George Snow, for taking ore from one of the Cornwall ore banks or mine hills in Lebanon county.

The plaintiffs claimed as heirs of Thomas Burd Coleman, deceased; the defendants were teamsters in the employ of E. B. & C. B. Grubb, sons of Henry Bates Grubb, who claimed a right to take the ore in question.

See the report of the case of Coleman *v.* Coleman, in 7 *Harris*, as to the question of partition of the Cornwall ore-banks.

The *Cornwall* estate once belonged to Peter Grubb, Sr. On 3d December, 1737, he obtained a patent for 300 acres, which included the mine hills in question in this case, in which all mines and minerals are expressly granted to him; and in pursuance of a warrant in the name of Samuel Grubb, but belonging to Peter Grubb, dated 19th May, 1744, a tract of land was surveyed on 4th June, 1744, adjoining the tract on which the mine hills were, and in which the survey is described as " beginning at a post, a corner of Peter Grubb's mine land."

[Coleman v. Grubb.]

The Cornwall estate, the subject of partition, &c., in 1787, consisted of various tracts of land, containing together about 9000 acres. *The Cornwall ore banks and mine hills*, forming part of two tracts of land, numbered 1 and 2 in that proceeding, and containing together about 750 acres of land, were parts of the *Cornwall Furnace estate*.

The Cornwall estate, being formerly vested in Peter Grubb, Sr., on his death descended to his two sons, *Curtis* and *Peter Grubb*, the former under the then intestate laws taking *two* shares. Curtis Grubb conveyed the one undivided sixth *to his son*, Peter Grubb; and the latter, on 9th May, 1787, in pursuance of articles of agreement, conveyed the one undivided sixth of the Cornwall estate so vested in him, to *Robert Coleman*, reserving to the grantor "a quantity of iron ore sufficient for any one furnace at all times thereafter."

In 1785, Robert Coleman owned *in severalty* the *Elizabeth Furnace estate;* and the minor children of Peter Grubb, Sr., owned the *Mount Hope Furnace estate.*

Thus, of *the Cornwall Furnace estate*, Curtis Grubb was owner of the undivided three-sixths; Robert Coleman of one-sixth; and Peter Grubb of two-sixths or one-third.

On 9th December, 1785, Curtis Grubb, Peter Grubb, and Robert Coleman entered into an agreement for the partition of the Cornwall Furnace estate, Hopewell Forges, and Union Forge, on Swatara Creek, held by them *in common*, in which they appointed seven persons named to make valuation, appraisement and partition thereof; and provided that *the ore banks belonging to Cornwall Furnace* be divided into three equal parts, and two equal third parts thereof, considering quantity and quality, be allotted to *Curtis Grubb* and *Robert Coleman*, and the other third part to *Peter Grubb*.

Peter Grubb died after the execution of the said agreement, viz. on or about the 21st January, 1786, having devised his real and personal estate to his two sons, Burd Grubb and Henry Bates Grubb, to be equally divided between them; and by the will Jasper Yeates and others were appointed their guardians.

Curtis Grubb, Robert Coleman, and Jasper Yeates and others, as guardians, entered into an agreement dated 6th May, 1786 (referring to the agreement of 1785), for the valuation and partition, &c., of the Cornwall Furnace property and other estate held in common, and providing that "the ore banks belonging to Cornwall Furnace aforesaid, *be divided into three equal parts*," and two equal third parts thereof, considering quantity and quality, be assigned and allotted to Curtis Grubb and Robert Coleman, and one-third part to Burd Grubb and Henry Bates Grubb, to be held by them respectively in severalty. Seven persons were appointed to make the valuation and partition, of whom Thomas Clark was one. In this agreement it was stated, "that the right of *Corn-*

*wall Furnace*, with such parts of the lands and the privileges as shall be deemed necessary and equal, is expressly agreed to be assigned to the said *Curtis* Grubb and Robert Coleman, according to their several shares thereof." An equivalent for their third part was to be rendered to Burd Grubb and Henry B. Grubb, in other of the real estate. Amicable actions of partition were to be entered into in Lancaster and Dauphin counties to effect the arrangements.

Subsequently, another agreement, dated 30th August, 1787, was entered into by Curtis Grubb and Robert Coleman and four of the guardians, in which it was stated, that, whereas it hath been found on the fullest investigation that the agreement entered into between Curtis Gubb, Robert Coleman, and the guardians of the minor children of Peter Grubb, deceased, could not be carried into execution without injustice to some of the parties, and the same have been so represented by the parties appointed in the said agreement to make partition; therefore it was agreed that certain persons referred to (Thomas Clark being one) shall make partition of Cornwall Furnace, Hopewell Forge, and all the lands, &c., late the property of Curtis Grubb and Peter Grubb, according to quantity and quality, &c., and to assign and allot the same according *to the real interests and conveniences of the several parties.*

"*Provided always*, and it is hereby agreed, that the *ore banks belonging to Cornwall Furnace shall remain together and undivided as a tenancy in common*, the said Curtis Grubb being entitled to three-sixth parts thereof, the said Robert Coleman being entitled to one-sixth part thereof, and the said minor children being entitled to the remaining two-sixth parts; *and that for this purpose an accurate survey shall be made of the said ore banks and hills, if not already done*, and it is hereby declared to be the true intent and meaning thereof, that neither of the said parties, their agents or workmen, shall interfere or interrupt either of the other parties at any mine hole by them opened and occupied for the purpose of raising iron ore."

A subsequent agreement was entered into between the same parties, dated *on the same day*, as follows :—

"*Whereas*, it hath been suggested that the article respecting the ore banks and hills requires further explanation, and that it may so happen that veins of ore may extend beyond the limits of the survey *made lately by Thomas Clark*, it is hereby expressly declared and agreed that the said Burd Grubb, Henry Bates Grubb, and Robert Coleman, and their respective heirs and assigns, shall have full liberty and privilege of ingress, egress, and regress to and from the said mine hills, and shall have free and uninterrupted liberty and power to dig, sink shafts, drive drifts, raise and carry away any ore that may be found to extend beyond the limits of the said survey, without doing any material damage to the iron works or plantations. And it is further agreed that

[Coleman v. Grubb.]

the privileges of the water are hereby secured in the most ample manner, for the use of Curtis Grubb and Robert Coleman, their heirs and assigns for ever, and that this memorandum be considered, to all intents and purposes, part of the foregoing agreement. In witness," &c.

In pursuance of such agreement, amicable actions of partition were entered into in the Common Pleas of Lancaster and Dauphin counties, and the referees, Thomas Clark being one, afterwards made report, which was dated the 31st August, 1787. They reported that they had viewed the Cornwall Furnace, Hopewell Forges, Union Forge, and all the other real estate late the property of Curtis Grubb and Peter Grubb, and had allotted three undivided fourth parts to Curtis Grubb, and one undivided fourth part to Robert Coleman, of Cornwall Furnace, and lands "hereinafter described and referred to in a draft or plot made by Thomas Clark, viz., No. 1 and No. 2, containing seven hundred and fifty acres, excepting thereout the draft of the ore banks and hills lately surveyed by the said Thomas Clark," No. 3, containing 600 acres, &c., &c., allotting various portions of property to Curtis Grubb and Robert Coleman to be held in common *as to each other*, but in severalty as to the minor children of Peter Grubb. Other allotments were made to Curtis Grubb and Robert Coleman in severalty—Union Forge being allotted to Curtis Grubb. They further allotted to Burd Grubb and Henry Bates Grubb, Hopewell Forges, and certain lands "described and referred to in the draft or plot aforesaid," &c. They awarded the payment of $1704.43, with interest, by Burd Grubb and Henry Bates Grubb to Robert Coleman, and by Curtis Grubb to him of above £31, and their report proceeded as follows: "And we do further report, that the tract of land, Bigham's Place, at Conewago, together with a small tract of forty acres of land adjoining thereto, and *also the ore banks and mine hills of Cornwall Furnace, do still remain undivided*, to be held by the said Curtis Grubb, Robert Coleman, Burd Grubb, and Henry Bates Grubb, *as tenants in common*, according to their respective shares, and to the covenants and articles in the said agreement hereinbefore recited contained."

The report was confirmed and partition ordered.

The estate of *Curtis Grubb* in Cornwall Furnace and the lands adjacent thereto, including the seven hundred and fifty acre tract hereinbefore mentioned, and also the estate of the said Curtis Grubb and the said *Burd* Grubb in the Cornwall ore banks and mine hills, became vested in Robert Coleman; and twenty-five undivided forty-eighth parts of the Cornwall ore banks and mine hills, and the Cornwall Furnace estate as aforesaid, were vested *in the plaintiffs* in this action when it was commenced.

Six undivided forty-eighth parts of the Cornwall ore banks and mine hills, being the quantity of the estate held by their father,

2 L

[Coleman *v.* Grubb.]

*Henry Bates Grubb*, at the time of the partition of 1787, were at the commencement of this action vested in Edward B. Grubb and Clement B. Grubb.

*The surface of the three hills whereon the Cornwall ore banks and mine hills are situated, had scattered over it in large quantities and partially imbedded in the soil, from the summit to the base, lumps or masses of ore, varying in size from a few pounds weight to several tons.*

In May, 1842, the defendants collected a portion of these and carried them away, under direction from Edward B. and Clement B. Grubb, and this suit was then brought, it being alleged, on part of plaintiffs, that this kind of ore, usually called *nigger heads*, was not within the terms of the partition of 1787, and that E. B. and C. B. Grubb had no authority to go *beyond the bounds of Clark's survey*, except by commencing *within it* and digging outward, following *veins of ore.* Clark's survey, and the construction of the partition of 1787, were the main points at issue in the case.

After the institution of the suit, an agreement in writing, dated 11th August, 1846, was signed by attorneys of the parties, by which it was agreed that E. B. Grubb and C. B. Grubb be substituted as the defendants; and it was agreed that at the institution of the suit, the fee simple in the land allotted by the referees to Curtis Grubb and Robert Coleman, was vested in the *plaintiffs*. Also, that at the time of the institution of the suits, the fee simple estate in the undivided five-sixths of three several tracts surveyed by Thomas Clark, *prout* the draft of the said survey, which is *made part of this case stated*, was vested in the plaintiffs, and the fee simple in the undivided sixth part in the said tracts was vested in the defendants, subject to the covenants in the agreements referred to.

It was further agreed that the parties shall select three iron-masters, or, in case of failure to select, then three iron-masters to be appointed by the Court, to decide upon the matters in controversy in this suit. A rule being granted on the defendants to show cause why the Court should not appoint three referees, a disavowal by E. B. Grubb of the reference was filed; and in September, 1847, the agreement to refer was stricken from the record. This was one of the errors assigned.

The first pleas put in were *non cul.*, with leave to give the special matters in evidence, and *liberum tenementum.* Subsequently new assignments and new pleas were filed, the plea of not guilty being withdrawn.

The pleadings were voluminous. See argument *postea* page, 406.

On part of plaintiffs, Jacob Weidle, a surveyor, was examined, who exhibited a draft of a survey of the mine hills made by him. He said he made it upon the basis of a survey alleged to have been

[Coleman v. Grubb.]

made by *Thomas Clark*; that he located the draft according to that survey.

Evidence was then given as to the handwriting of Thomas Clark, and that he had been dead near forty years.

There was then offered in evidence a draft alleged to be the draft made by Thomas Clark, and referred to in the report of the referees who made the partition. The draft was objected to as not being sufficiently proved, and that it was without date; but the Court decided that it was sufficiently proved to be submitted to the jury. Exception was taken.

The surveyor stated that he found no stones or posts set to indicate Clark's survey; that it does not extend to *the foot of the hill*.

On part of *the defendants*, Hoffer, another surveyor, was examined, who stated that he could not locate on the ground the alleged survey by Clark.

It was then offered to show the extent of *the hills;* and that the paper produced as Clark's survey was not *an accurate* delineation of the hills, and could not have been intended as the survey thereof. This was objected to on the ground that Clark's survey, and not the hills as they exist, is to designate the rights of the parties. The testimony was admitted, and was the subject of exception.

This witness said the hills were in most places well defined; in some not.

*H. D. Rogers* was examined, and, *inter alia*, testified that according to his present information, Clark's survey does not embrace *all the ore;* that he thought a larger area would have to be included to take in the whole of *the big hill;* that topographers might disagree as to the exact place where a hill terminates and the plane begins. He said he considered *the house* to be below the hill. He testified that this mine ore he considered stratified; that the ore in these hills does not belong to the class of *hematite* —is but slightly magnetic. The ore exposed to the elements has passed to the condition of hematite; that the *nigger heads* approach nearer to hematite, having been acted on by the elements.

*J. E. Rogers* testified that he considered that Clark's survey did not embrace near all the hill, topographically speaking. That the several hills are of one geological formation; the ore being of several varieties, but of the same general character; that the nigger heads were boulders from the harder ore, but were homogeneous with the other ore, of a different composition but of the same formation. Another witness said that he was administrator of Grubb's estate; managed Mount Hope Furnace for seven years; got ore from Middle, Grassy, and Big Hill, and never heard of any survey or marks around the hills; also that the mines were often broken by faults and rock; that the three hills are distinct and well defined; considered it a mass of ore, not veins; judged by the surface. Another witness said that he was employed in

[Coleman *v.* Grubb.]

working ore from the hills about 48 years before; that he never saw or heard of lines on the ground limiting the ore digging; that nigger heads were taken to Mount Vernon, Mount Hope, and other furnaces of Grubb's. Another witness said that the Clark survey was 200 yards from the top of the hill, and in places about as far from the bottom; and another said that he had been nine years at the works, and always began to mine *from the bottom of the hill;* that he had mined on *the outside* of the Clark survey; was digging for Grubbs; that the mine was commenced before his time; did not know whether it was begun outside or inside of the Clark survey.

PEARSON, President Judge, in his charge to the jury observed, " that to the declaration of the plaintiffs complaining of a trespass on their freehold, the defendants aver in substance, *first*, that it is their own free tenement; *second*, that it belongs to the plaintiffs and E. B. and C. B. Grubb, as tenants in common, and that they entered under the authority of the latter; *thirdly*, that if it is not within the freehold held in common, that Grubbs had, under the arrangement of 1787, a right to enter and remove the ore taken. That whether the ore taken was situate outside of the property held in common under the agreement made in 1787, depended on the location of the land reserved from *partition*. If the ore was removed from the land held as a tenancy in common by Coleman and Grubbs, this action will not lie; nor can it be sustained if Grubbs had a license to dig on the mine hills, where the trespass was committed, beyond the line of their common estate."

In relation to the survey alleged to have been made by Thomas Clark, he observed, " that the written agreement of the parties showed that he had surveyed the hills and ore banks agreed to be excluded from partition, and that it was but fair to infer that the act was done for that purpose. He observed that from the endorsement on its back, stating that it was made for Curtis Grubb, Peter Grubb, and Robert Coleman, it was contended on part of the defendants that it was made in the lifetime of Peter Grubb; but he considered it unreasonable to suppose that it was made before any idea seemed to have been entertained of excluding the mine hills from partition, and that it had been carelessly endorsed. He however submitted to the jury to decide whether the survey was made by Thomas Clark, for the purpose of defining the ore hills, and was the one referred to in the writing or not. That if the jury concluded that it was, then to inquire as to whether it was intended to represent a survey marked and defined on the ground, or was made from conjecture; and whether it is possible at this time to locate it with reasonable certainty. * * * If no survey was made, or none can now be discovered, the co-tenants in common or those claiming under them, would have a right to obtain ore from any portion of the ore banks and hills, provided the line to designate the place of taking ore should be so run as to secure the

[Coleman v. Grubb.]

privilege of the water to the owner of Cornwall estate, and no material damage be done to the iron works and plantation." * * * He further observed, " that the great difficulty was to ascertain whether the draft produced, correctly delineated the survey referred to in the report of the referees, or whether some other draft at one time existed. 'Wherever Thomas Clark's survey was made, there the tenancy in common is bounded.'"

In answer to the plaintiff's *first* point he charged, that "in the absence of any proof of a survey, the ore banks and hills are excluded from partition, and are not presumed to have been embraced. It would have been a violation of the agreement of the parties to have included them. They never were vested in the plaintiffs, or those through whom they claim in severalty; and any one of the tenants in common would have a right to dig ore on any part of the hills, provided they did not violate the agreement as to encroaching on the water rights, or materially injuring the iron works or plantation, but they have no privilege to go beyond the hills."

He further observed, " Taking it for granted that Thomas Clark made a survey of the premises, as averred by the plaintiffs, and that the ore in dispute was removed from *without* the boundaries of that survey, had Grubbs a right to do the act under the agreement of August 30, 1787 ? That depends upon the construction of the writing, which is a question solely for *the Court*."

He charged that under the supplementary agreement of August, 1787, the Grubbs were not bound to commence *within* the lines of Clark's survey, and work outwards into the adjoining premises; that the vein need not be continuous or connected with the ore within the lines, or unbroken by trap rock, or otherwise, or be *an extension* of the vein of ore. He expressed the opinion that the Grubbs had full authority under the agreement to remove the ore complained of.

He added, " We are desirous that you should decide whether the draft in evidence was or was not made by Thomas Clark for the purpose of designating the land exempted from partition, as the establishment of that fact may be important to the parties hereafter. But as we have already said that the action cannot be sustained whether the ore taken was within or without the lines of Clark's survey (provided it was *on either of the mine hills*, which is proved and conceded), it (the survey) is not very important to the decision of the present case."

He added, " In the very confused state of the pleadings, it is difficult for us to instruct on which of the various issues to render your verdict; but when agreed on, we will endeavor to put it in such form as will prejudice none of the plaintiff's rights hereafter."

April 13th, 1854, the jury say that they find that the defendants were acting for and under E. B. Grubb and Clement B. Grubb ;

and as they were instructed by the Court, had a right, according to the provisions of the agreement entered into on the 30th day of August, 1787, between Curtis Grubb, Robert Coleman, J. Yeates, Ed. Burd, Joseph Shippen, Jr., and Edward Hand, for the purpose of making partition to dig the ore complained of in plaintiff's *narr.*, whether the same was situate within or without the bounds of Thomas Clark's survey, and were justifiable in so doing; and that they do not find whether the draft alleged to have been made by Thomas Clark, and given in evidence in this case, was or was not the survey referred to in the proceedings in partition; and they do not find whether the place on which the alleged trespass was committed, was within or without the bounds of the said survey, or on the property held in common or not; and the defendants being so justified, they find a verdict *in favor of the defendants.*

Motions were made for a new trial, and in arrest of judgment; and reasons were filed.

PEARSON, J., in his opinion, *inter alia*, observed:— "In our opinion the evidence in favor of the draft having been made for the purpose of designating the survey, greatly preponderated; but the jury declining to determine the point one way or the other, injures neither party, and leaves the question open for future adjudication. According to our construction of the supplemental agreement of the 30th August, 1787, the defendants were justified in removing the ore, whether found within or without the bounds of the survey, and on the correctness or incorrectness of that opinion the cause turned, and if we construed it rightly, must always turn.    We are not yet convinced of any error in that opinion, and therefore overrule the motion for a new trial."

As to whether the pleadings are or are not such as to sustain a judgment, he, *inter alia*, observed that " as no defects were pointed out on the trial, or on the motion in arrest of judgment, we take it for granted they are regular.    The verdict was drawn up hastily, and for the mere purpose of avoiding injury to the plaintiffs' title, by reason of any of the various pleas inserted by the defendants. All that was intended by the verdict, was to exclude a conclusion. If it has that effect it will have performed its office, as there is a general finding for the defendants, with a sufficient statement that they did not pass on or determine the titles of the parties, but found, under the instruction of the Court, that there was a license to dig and remove the ore."

It was assigned for error: 1. The Court erred in permitting the defendants to give evidence of the extent of the hills, on and around the summit of which, the Cornwall ore banks and mine hills are located, as pertinent to the location of Clark's survey, such evidence tending to mislead the jury as to the true point at

issue.　2. The Court erred in admitting the draft of Esquire Hoffer, purporting to show the extent of the Cornwall hills, by taking the water line at the base of them as pertinent to the location of Clark's survey, such evidence tending to mislead the jury as to the true point at issue.　In 3d and 4th it was alleged that the Court erred in the charge as to the *first* point, and also in avoiding it.　5. The Court further erred in their answer to the plaintiffs' first point, in this : That in connexion with that portion of their answer to the plaintiffs' first point, quoted in the fourth specification of error, the Court also say : "If no survey was made, then we must resort to the next best evidence—the other portion of the description of the agreement—'the ore banks and hills.' "　Which was error, because it submitted to the jury the question whether Clark's survey had ever been made, whereas the agreements of the parties and the record of the partition of 1787, were conclusive evidence in law that it had been made ; and if they were not conclusive, there was no evidence that it was *not* made.　6. The Court erred in all that part of their charge relating to the construction of the supplementary agreement of 30th August, 1787, which is in answer to the plaintiffs' second point. 7. The Court erred in entering judgment on the verdict, because it did not find any issue joined.　8. The Court erred in striking off the agreement to refer.

*Weidman,* for plaintiff in error.—It was contended that whether viewed as a record or as an agreement, the contents of the supplementary agreement of 1787 were conclusive upon the defendants, and that the Court should not have permitted them to invalidate the fact of Clark's survey, sanctioned by the deed of the party and the judgment of the Court ; and that the defendants were limited to the bounds of that survey, and were not entitled to go beyond it.

It was contended that the Court erred in their construction of the supplementary agreement of 30th August, 1787.　The main purpose of the parties was *partition.*　By the *first* agreement of that day, it was stipulated that an accurate survey should be made of the *ore banks and mine hills,* to which alone the tenancy in common should be applicable.　All beyond that was to belong to whomsoever it was assigned in the partition.　If there had been no other agreement, it was said that the defendants could not have taken any ore beyond the limits of the survey.

After the first agreement was executed, it appeared to the parties, perhaps by the production of Clark's survey, that the veins of ore might extend beyond the limits of the survey.　It was said that it was evident that the parties meant to retain the interest they then held in such ore as was then *known to exist in a mass or body* within the limits of the survey, and to resign their right

[Coleman *v.* Grubb.]

to all else. The extension of the mass of ore they could not know, and therefore they use doubtful language. The intention was to secure to each owner an interest in the *main body* of the ore, should it happen to extend beyond the limits of the survey. A stipulation, therefore, which enabled the parties to pursue the main body of ore outside of the lines of the survey within the lines was consistent with the main intention of the parties.

If the construction of the Court were unsound as to *the main body of ore*, it was especially so when applied to the detached ore scattered over the surface, weighing from several pounds to several tons, as this did not constitute *a vein of ore*, and its existence was evident to the parties.

The pleadings made *two* issues,—1. Whether the ore was taken within the bounds of the survey. 2. Whether the taking of the ore was within the provisions of the supplementary agreement of August, 1787, permitting parties to follow the ore when it extended beyond the bounds of the survey. The verdict does not find either of these; nor indeed any issue. The substance of the issue should be found: *Salkeld* 372; 1 *Ld. Raymond* 324; 2 *Id.* 1518; 2 *Tidd* 922; 5 *Cranch* 19.

8th assignment. An attorney has power to refer a cause: 6 *Binn.* 99; 16 *Mass.* 396; 7 *Cowen* 744; 11 *Law Lib.* 26.

*Penrose*, for defendants in error.—The mine hills are three in number, known as Big Hill, which is about 300 feet high; Middle Hill, about 175 feet in height; and Grassy Hill, about 100 feet in height. At the base of each are small streams of water which mark the termination or foot of the hill. On survey, made shortly before the trial, they were found to contain 297¼ acres. The north and northeastern slope of the *Big Hill, from which the ore in question was taken*, averaged 20° or 30° of elevation from the stream at its base. The Cornwall furnace, dwelling-house, and coal-house, are quite near to the Western or Northwestern base of the Big Hill, and, in part, on a spur of it. The three hills are of one continuous deposit, and the formation has distinct boundaries. In their natural state they were covered from the summit to the base, to the streams of water, with top ore, from one to fifteen feet in thickness. It was called (by miners) *nigger heads*, and varied in size from a pound weight or less to masses weighing ten tons or more, and with these was intermingled fine ore. The north slope of the big hill was covered with ore in this way, not in detached lumps, but with lumps or masses so intermingled, not wholly *on*, but also *under* the surface to various depths. In many parts of the hills, after passing through the top ore, ore more compact is found called body ore, which also, however, contain nigger heads, or masses such as existed on the surface.

[Coleman v. Grubb.]

The referees appointed for the division of the ore banks belonging to Cornwall Furnace into three parts, &c., advised the parties that the agreement could not be carried into execution; and, in pursuance of such recommendation, the first agreement of 30th August, 1787, was made to make partition according to quantity and quality, and to assign according to *the real interests and convenience of the parties.* By this agreement, the parties were to have right to dig, sink shafts, raise and carry away any ore that may be found to extend beyond the limits of the survey. The purpose was to secure to each party a full share of all the ore in the mines. An *accurate survey of the ore banks and hills* was to be made. The survey was but secondary evidence of the banks as exhibited in it. The survey was to be *accurate.* The courses and distances of a survey but point to the place: 8 *Barr* 154; 6 *Id.* 258. The words, *if not already done,* may indicate a doubt whether a survey already made was accurate. To this agreement Thomas Clark was a witness. In the supplemental agreement it is assumed that the survey had been lately made; but by this agreement full liberty of ingress and regress was given to and from the *mine hills.*

If the right to dig ore found outside of the limits of the survey is the right to take such ore as was a part of the same deposit as in that of the hills, then, whether the survey was accurate or not was not material, as the ore was secured to the parties. If the ore was secured, why limit the parties to an inconvenient way of working in order to prove that the ore outside of the survey is part of the ore of the hills? Though the agreement refers to the veins of ore which *may exist,* the agreement was not designed to exclude the ore which was *visible* on the surface. The word *vein* was not used in its geological, but in its popular sense, to describe the ore *as it existed in the hills.* The right to dig, sink shafts, and drive drifts, &c., comprehends the right to exercise every mode in which ore is sought for and raised; and drifts are driven up and not down a hill; the only limitation being the refraining from doing material damage to the iron works or plantations.

It was not disputed that a survey of the ore banks had been made by Thomas Clark, and it was admitted that such a survey was referred to in the agreement of 1787 as one lately made; but it was disputed whether the survey produced was *that survey.* The draft in question was run by Weidle, a surveyor, in 1814, and he found no marks of that survey on the ground. It was not an accurate survey of the hills. It comprehended a portion of Templeton's Hill, which was separated from the Big Hill, and on which there was no evidence of ore. The lines of the survey did not coincide with the lines of the base of the hill; one of the witnesses stated, that one of the lines of Clark's survey was "40 or

[Coleman *v.* Grubb.]

50 perches from the foot of the hill. In some places it is half way down the hill—in some places more, in some less." Weidle's survey embraced only 104 acres, while the hills included an area of 297 acres.

The evidence given by defendants to show the extent of the hills, and that they were distinct and defined upon the ground, was relevant to show that the draft in evidence was not the draft referred to in the agreement of 1787, and an accurate survey of the hills ; and also to determine the true construction of the agreement respecting them.

A Court is not bound specifically to answer points, if they be answered in the general charge : 6 *Harris* 215.

The portion of the verdict failing to find as to the draft, or whether the place from which the ore was taken was within the bounds of the survey, or on the property held in common, was immaterial, and might be rejected as surplusage : 8 *Ser. & R.* 441 ; 1 *Watts* 259 ; *Whar. Dig.* pl. 917. It was found, according to the instructions of the Court, that the defendants were justified whether the ore was taken *within* or *without the bounds of Clark's survey*. The verdict was not special, but *general : 2 Harris* 21.

The pleadings on part of the defendants presented *two* issues.

In the first four pleas was averred the incorporeal hereditament, created by the agreement of 30th August, 1787, and there was set out at large the proceedings under that agreement as the foundation of the title. In them was averred and specifically pleaded the title by which this incorporeal hereditament was vested in E. and C. B. Grubb—and a license from them to the defendants sued. These pleas were pleas of justification under this incorporeal hereditament.

Upon the suggestion that under the general plea of *liberum tenementum* to the novel assignment of the plaintiff, the defendants could not give in evidence the freehold title of E. and C. B. Grubb to the tenancy in common under the agreement of 1787, and a license to defendants, another special plea was filed setting forth, by reference to the other plea, such freehold title and the license. This also was a special plea of justification, and upon these issues the cause was tried. The plaintiffs did not put in any replication to the special plea of *liberum tenementum*, but went to trial on that plea. Thus there were two justifications well pleaded by defendants, either of which being found for them, they were entitled to a general acquittal, and it was not necessary to enter the verdict on either of the pleas : 8 *Watts* 37, Wilson *v.* Gray.

The agreement to refer was *by its terms* to be considered as made under the Act of 16th June, 1836. That Act excepts such suits as respect *the title to real estate*. It appeared that the reference was made without authority from E. B. Grubb, who disavowed it. The

agreement was executory, and nothing had been done under it. It was capable of being revoked: 9 *Barr* 101; 2 *Watts* 492; 4 *Watts* 312.

*Stevens*, on same side.

*Meredith*, for plaintiff in error.—The portion of the verdict alleged as surplusage was not so, and judgment should not have been entered without the issues submitted being found.

It was contended that the whole of the hills as *natural objects* were not intended to be included within the lines of Clark's survey. The material question was whether the parties were to hold by the hills as natural objects, or by the deeds and the survey—and that unless the supplementary agreement of 1787 is to be confined to ore beginning within the survey, it may extend to the whole of the Cornwall estate.

The opinion of the Court was delivered by

WOODWARD, J.—If the Court were right in the construction they placed on the agreements of 1787, the right of the Grubbs to take ore from the *locus in quo* is established, the entry of the defendants under them and as their servants is justified, and all the other questions in the cause disappear, or lose, at least, a controlling influence.

When it was found "on the fullest investigation" that the large and valuable estates connected with these mine hills could not be parted in severalty among the owners without great injustice to some of them, the agreement of 30th August, 1787, devised a plan of dividing all except the mine hills, and of keeping them for the common use, undivided, and as a tenancy in common. The difficulties in the way of equal partition of the hills, and the motives and reasons for agreeing to hold them undivided, were fully discussed in Coleman v. Coleman, 7 *Harris* 100, and need not be again entered into here. The question now is whether anything less than the whole of the mine hills was exempted from partition, and appointed to be held in common. The plaintiffs insist that the Clark survey, as it is called, designated what was meant by the mine hills in these agreements; and as Clark's lines ran around the hills some distance above their natural base, and above the place from which the defendants took the ore in question, they deny the right of the Grubbs to mine below that line, except it be in pursuit of a vein struck above. Such was not the opinion of the Court below, and such is not our opinion.

In the first agreement of 30th August, 1787, these hills are called "ore banks;" in the supplemental agreement of the same date "ore banks and hills;" and in the report of referees acting

under these agreements they are called the "ore banks and mine hills of Cornwall Furnace." They are three prominent, peculiar, well-defined, natural objects, and it is impossible for us to suppose that the parties intended to exempt from partition anything less than the whole of each of these hills from base to top. There is not a word in the first agreement of 1787 to indicate such an intention, or to impose any limitation on the tenants in common as to the places in the hills where they were to mine, except that their agents and workmen should not interrupt each other in their respective mine holes. Whatever might fairly be understood as constituting the "ore banks" was to be held in common, and where-ever in or upon these banks the parties found ore, whether "nigger heads," surface, or vein ore, they might take it, so as not to interfere with each other's openings. Such was the agreement as at first made on the 30th August, 1787. The supplement of the same day was intended to explain the article respecting the ore banks, and it is supposed to have imposed limits on the rights of such of the tenants in common, in whom it vested an incorporeal estate, according to a survey said to have been then lately made by Thomas Clark. I confess the words of this supplement would never strike me as a *limitation*, but rather as an *extension* of the rights of the parties. Free ingress, egress, and regress are secured to each owner "to and from *said mine hills*," and "the free and uninterrupted liberty and power to dig, sink shafts, drive drifts, raise and carry away ore that may be found to extend beyond the limits of the said survey, without doing any material damage to the iron works or plantations." What "the survey made lately by Thomas Clark" was, does not appear. The agreement of which this supplement was explanatory, provided that "an accurate sur-vey should be made of the said ore banks and hills, if not already done;" and the referees filed with their report a survey made by Thomas Clark of the estates divided, but on which they did not designate the mine hills.

On the trial of this cause a survey was put in evidence professing to be the survey alluded to in the agreement and supplement, and the Court submitted it to the jury to find whether it was indeed that survey or not; but they returned "that they do not find whe-ther the draft alleged to have been made by Thomas Clark, and given in evidence in this case, was or was not the survey referred to in the proceedings in partition." We are, therefore, destitute of the Clark survey of the mine hills, a circumstance which might be very embarrassing if we were trying rights clearly beyond the natural boundaries of the hills, but for this reason it is more easy to say, nay, it is inevitably necessary to say, that an entry by one of the tenants in common, within the natural boundaries of the hills, was justified by the agreements of 1787. Beside, in the absence of the Clark survey, it is fair to presume that it embraced

the hills as they stand before the eye, for it was to be " an accurate survey," and the survey of the residue of the joint estate as returned by the referees, instead of embracing a portion of the hills excluded them altogether.

If the Clark survey were such, as in its absence we feel at liberty to presume it was, then the supplemental agreement was in fact, as its words import, an extension, instead of a limitation of the rights of the tenants in common. Shafts might be sunk and drifts made beyond the base of the mine hills for the purpose of mining veins found to be contained in them. Veins of ore, conforming in their dip to the surface of such hills, could be advantageously mined only by taking position beyond the base of the hills, sinking a shaft to the vein, and then mining it upward to the outcrop. This was probably what was intended to be secured to the parties, and hence the stipulation against damage to the "iron works and plantations"—all of which would be found beyond the hills and none of them on it.

All this, it must be admitted, is somewhat speculative, for it is reasoning in regard to a survey which the jury could not establish from the evidence before them ; but it is considered a more reasonable interpretation of the agreement of the parties than one which would limit them to an upper section of the hills, and compel them to follow a vein downward instead of upward. Considerable emphasis was laid on the word " extend" in the supplemental agreement, but I see no necessity for presuming that a vein was to be mined downward to determine whether it extended beyond given limits. When iron ore is found in veins and their angle of inclination is ascertained, it is easily determined on the surface, with sufficient accuracy for practical purposes, whether they extend beyond the specified limit.

But dismissing all views which connect themselves with the Clark survey, and confining our attention to the terms employed by the parties, we have no difficulty in saying that the mine hills as natural objects, those three upheaved masses of rock and ore, the outline of which is no doubt familiar to the eye of every neighbor and miner, were what the parties exempted from partition and agreed to hold in common ; and if hereafter geologists cannot agree, as to the limits of the hills—at what points they begin to rise—no such question is present to embarrass us here, for the ore sued for was confessedly taken from the body of the main eastern hill, someway above its base. If we accounted the words of the parties doubtful and uncertain, we should be guided to the same construction of their agreements by their long usage. For two generations they and their descendants have treated these mine hills as a tenancy in common, and have used them as appurtenant to their respective furnaces and forges. How can it be expected that at this late day Courts should construe the agreements of 1787 in opposition to this contemporaneous

[Coleman *v.* Grubb.]

exposition? There is nothing in the verbiology of the papers, in the history of the property, or in the evidence in the cause to excuse, I will not say to demand a construction that would exclude some of the tenants in common from the treasures of these extraordinary hills. Their ancestors agreed to hold them in common, and as a common inheritance they have descended to the present owners. Whilst they hold them thus, and whilst the ore lasts, we have decided them to be impartible; and it follows that actions of trespass among themselves are not the remedies for grievances whether fancied or real.

As to the seventh assignment of error, it is sufficient to say that the pleadings, though unnecessarily voluminous, fairly raised the issue on which the cause was put to the jury, and that issue they found distinctly for the defendants. The residue of their verdict is harmless, and might have been rejected as surplusage by the Court. The rule that judgment cannot be entered on a general verdict for a plaintiff where his declaration contains two or more counts, one of which is bad, does not apply to the pleas of a defendant sued in trespass. If he have a single good plea that goes to the plaintiff's right of action, and a general verdict passes for him, he is entitled to judgment though some of his pleas are bad, unless it appear that the evidence was inapplicable to his perfect plea: Wilson *v.* Gray, 6 *Watts* 37. Here the title of the parties under whom the defendants justified was well pleaded, and having the verdict they were entitled to the judgment.

There is nothing in the eighth assignment; for, though counsel have a right to submit the client's cause to reference, the client has a right to revoke the submission, which Mr. Grubb did do in good time: Wilson *v.* Young, 9 *Barr;* Bingham's Trustees *v.* Guthrie, 7 *Harris* 418.

On the whole we see no error in the record, and the judgment is accordingly affirmed.